IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOPHIA O'NEILL, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. |
| TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | : JURY TRIAL DEMANDED |
| Defendant. | : |

COMPLAINT

Plaintiff, Sophia O'Neill ("Plaintiff"), by and through her counsel, files this Complaint and asserts claims of sex-based discrimination and retaliation against the Trustees of the University of Pennsylvania ("Defendant" or "Penn").

INTRODUCTION

This case is about Penn's refusal to protect a young female employee from sexual harassment by a mentally unstable male student, which forced her to choose between her safety and her job. Penn then retaliated against its devoted and accomplished former employee for filing a complaint about the sexual harassment by giving negative references to her prospective employers. Plaintiff has filed this lawsuit to hold Penn accountable for its willful violations of her civil rights.

JURISDICTION AND VENUE

1.      This action for discrimination and retaliation is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., as amended.

1

2. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction with respect to Plaintiff's claims for sex-based discrimination and retaliation under the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code § 9-1101, et seq.

4. This case is not subject to compulsory arbitration because Plaintiff seeks injunctive relief and the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000), exclusive of interest and costs.

5. Plaintiff has exhausted her administrative remedies, having timely filed complaints of discrimination and retaliation with the Philadelphia Commission on Human Relations, which were cross filed with the Equal Employment Opportunity Commission.

6. Plaintiff filed her first administrative Complaint (PCHR No. 2023-06-09; EEOC No. 17G-2023-00029) on May 4, 2023.

7. Plaintiff filed an Amended Complaint, adding allegations of retaliation on August 23, 2023.

8. The PCHR issued its Dismissal and Notice of Rights with respect to both administrative complaints on February 21, 2025.

9. Venue is properly invoked pursuant to 29 U.S.C. § 1391(b) because the actions complained of herein occurred within the jurisdictional limit of this Court.

## PARTIES

10. Plaintiff, Sophia O'Neill, is an adult female individual who resided in Philadelphia, Pennsylvania in 2022 and 2023 before she relocated out of the country to accept new employment.

11. The Trustees of the University of Pennsylvania, operating as the University of Pennsylvania, is a private educational institution comprised of twelve (12) schools, including Weitzman School of Design, Communications, Arts & Sciences, among others.

12. Penn is located in Philadelphia, PA 19104, and employs thousands of individuals in Philadelphia.

13. At all times relevant to this Complaint, Penn was Ms. O'Neill's employer within the meaning of Title VII and the PFPO.

14. Defendant's discriminatory and retaliatory actions as described herein took place within Philadelphia, Pennsylvania.

15. At all times relevant to this Complaint, Penn acted by and through its authorized agents and/or employees within the course and scope of their employment at Penn.

FACTUAL ALLEGATIONS

Background and Ms. O'Neill's Employment at Penn

16. Ms. O'Neill is a 2020 graduate of Cornell University, where she earned her Bachelor of Science Degree in Urban and Regional Studies.

17. In 2022, Ms. O'Neill earned a Masters of Science in Design: Robotics and Autonomous systems from Penn's Weitzman School of Design.

18. Later that year, Penn hired Ms. O'Neill as a full-time Research Associate in the Advanced Research and Innovation (ARI) lab, effective August 15, 2022, with an annual salary of $50,000. Ms. O'Neill was specifically assigned to work in the Autonomous Manufacturing lab, also referred to as the ARI Robotics lab.

19. The ARI Robotics lab houses large industrial robots, which are very powerful (and potentially dangerous) machines, used by Penn students with the supervision of the lab managers.

20. Ms. O'Neill shared responsibility for managing the ARI Robotics lab with Nick Sideropolous (male).

21. Both Ms. O'Neill and Mr. Sideropolous reported to Robert Stuart-Smith, Program Director for the ARI Robotics lab, who in turn reported to Karl Wellman, Senior Director of Design and Construction and Operations and Planning.

22. On November 18, 2022, Penn offered Ms. O'Neill a part-time faculty position as the Teaching Assistant for Mr. Ezio Blassetti's Seminar and Studio, which included an additional salary of $8,650.

23. As of January 9, 2023, Penn confirmed Ms. O'Neill's hiring for the Teaching Assistant position for Robert Stuart-Smith's Studio (as well as a TA for Advanced Robotics Autonomous Systems Programming Seminar) for the Spring semester.

Penn's Tolerance of Harassing and Dangerous Conduct By A Male Student

24. Upon information and belief, at the start of the Fall semester, HR[1] (male), a student in Mr. Stuart-Smith's design studio, subjected a fellow female student assigned to his work group to sex-based harassment.

25. As a result of the female student's complaint to Penn about HR's conduct, Penn reassigned HR to another student work group of all male students.

---

[1] Since this Complaint contains medical information about the student, albeit information he shared with teachers and students, Plaintiff has elected to identify him only by initials to prevent any unnecessary breaches of medical privacy.

4

26. Upon information and belief, Penn took no other remedial measures to address HR's creation of a sex-based hostile environment for his fellow student.

27. Throughout the Fall semester, both before and after his group reassignment, Ms. O'Neill observed that HR engaged in inappropriate behavior in the lab, including but not limited to: running the robots at unsafe speeds, insisting that he be permitted to use the robots without signing up for approved time slots, and complaining on social media that his fellow students were not pulling their weight. HR also regularly demanded that Ms. O'Neill help him with his assignments, often hovering over her desk.

28. HR is substantially taller, larger, heavier, and stronger than Ms. O'Neill.

29. Ms. O'Neill advised Mr. Stuart-Smith about her observations of HR's inappropriate behaviors as they occurred.

30. Upon information and belief, multiple students complained about HR's behavior in the lab during the Fall semester.

31. Over the winter break between the Fall and Spring semesters, Mr. Stuart-Smith contacted Ms. O'Neill to discuss the student assistant positions for the Spring semester. In that discussion, Mr. Stuart-Smith shared that HR had submitted applications for advertised positions but was "obviously not being considered" for any of the student assistant positions as HR had a psychological evaluation mandated by Penn, nor would he be able to participate in any student group work for the Spring Semester.

32. On Friday, February 3, 2023, Ms. O'Neill attended a Penn-sponsored happy hour after her shift ended at the lab. When Ms. O'Neill returned to the lab after the happy hour to pick up her backpack and other belongings, HR was in the lab using a robot and insisted that she help

him. Ms. O'Neill provided some general guidance to HR, but did not engage with the robot since she was not on duty and had consumed alcohol at the happy hour.

33.     On Monday, February 6, 2023, Ms. O'Neill learned from Mr. Stuart-Smith that HR had complained about her refusal to help him the prior Friday evening. Although she did not see the email, Ms. O'Neill heard from Mr. Stuart-Smith that HR's email was "aggressive" and accused her of being "drunk" and "unprofessional."

34.     At that time, and thereafter, Mr. Stuart-Smith confirmed that Ms. O'Neill's behavior had been appropriate and professional.

35.     A couple of weeks later, on Friday, February 17, 2023, HR again demanded that Ms. O'Neill help him with his work assignments. Specifically, HR asked Ms. O'Neill to give him a completed branching script. Ms. O'Neill confirmed that she would help him, but not until he made an effort to complete at least part of the assignment.

<u>Penn's Refusal to Address HR's Misconduct Results In His Sexual Harassment of O'Neill During A Depressive Psychotic Episode</u>

36.     On February 18-19, 2023, HR sent the following messages to Ms. O'Neill on Discord, a collaboration platform used by Penn professors and students:

> **<u>2.18.23 at 7:31 am</u>:**
> Hey soph. I think I'm going too deep into depression. Please come home and stay with me if you can.
>
> **<u>2.18.2023 at 8:02 pm</u>:**
> Love you so much babe [heart and kiss emojis] come soon
>
> **<u>2.18.2023 at 10:48 pm</u>:**
> [picture]
>
> **<u>2.18.2023 at 11:26 pm</u>:**
> 4454569794
>
> **<u>2.19.2023 at 2:43 am</u>:**
> [missed phone call]

**2.19.2023 at 3:40 am:**
Sorry. I had a **depressive psychotic episode** the past three days. I'm fine today.

(emphasis added).

37. Ms. O'Neill did not open HR's messages on Discord as they came in because they had been sent outside of working hours. Ms. O'Neill also did not open HR's messages once she reported to work because she assumed they related to his insistence that she help him with his assignment.

38. While in the lab on Monday, February 20, 2023, HR continued to demand that Ms. O'Neill give him the script for his assignment. As he spoke to Ms. O'Neill, HR towered over her desk.

39. Thereafter, Ms. O'Neill asked to speak to Mr. Stuart-Smith in the hallway outside the lab. Ms. O'Neill reported HR's demands of her, and that his conduct made her uncomfortable. In response, Mr. Stuart-Smith advised Ms. O'Neill to give HR the completed script and to make sure he completed his assignments.

40. In the early morning hours of February 21, 2023, HR sent additional messages to Ms. O'Neill on Discord:

**At 1:25 am:**
Going to surprise you [heart emoji]

**At 4:03 am:**
4454569794
4454569794*

41. On Wednesday morning, February 22, 2023, HR was waiting for Ms. O'Neill outside the lab when she arrived for work at 8:45 am. By that time, Ms. O'Neill noticed that HR sent additional messages to her on Discord, but she had not opened any of them.

7

42. That morning, HR again demanded help from Ms. O'Neill, saying that he could not figure out the script.

43. HR also had time reserved that morning to work on the robot. While working on the robot, HR repeatedly sought Ms. O'Neill's assistance by either standing over her desk or calling over to her from the enclosure where the robot was housed.

44. At one point, HR insisted that Ms. O'Neill clean clay out of the robot nozzle for him. While Ms. O'Neill was cleaning the robot nozzle, HR was vaping while he stood by watching her.

45. When Ms. O'Neill tried to leave the enclosure that housed the robot, HR blocked the doorway, stared her down and refused to move until she told him he had to move out of the way and let her pass.

46. Once she returned to her desk, Ms. O'Neill focused on other tasks, including reviewing student messages for her on Discord.

47. Upon seeing the messages from HR, Ms. O'Neill became alarmed and scared for safety, particularly since he had just attempted to physically intimidate her by blocking her way.

48. Ms. O'Neill immediately advised the Student Assistant in the lab at the time that she had to leave and asked him to take over.

49. Upon leaving the lab, Ms. O'Neill ran as quickly as she could to Mr. Wellman's office. When he emerged from a meeting, Ms. O'Neill showed him the Discord messages on her laptop computer. Mr. Wellman then directed Ms. O'Neill to walk with him to the Student Services office where they met with Kayla Richards, Associate Director for Student Support, and contacted Paige Wigginton, Ed.D, Director of Special Services, by telephone.

Penn's Refusal to Maintain A Safe Environment for O'Neill and/or Her Students

50. During the meeting in Ms. Richards' office, Ms. O'Neill became aware that Penn management was already aware of an "on-going" case relating to HR that included a report to Penn police about his behavior. In response to requests from Penn, Ms. O'Neill provided screen shots of the Discord messages from HR.

51. Penn's representatives advised Ms. O'Neill that she should go home following the meeting, which she did.

52. At Ms. Wigginton's request, Ms. O'Neill met with her in the Penn Safety Building on February 24, 2023. During that discussion, Ms. Wigginton advised that Penn was willing to take certain actions to address HR's conduct: (1) Limit his ability to sign up for time in the lab with Mr. Sideropolous, not Ms. O'Neill; and (2) Restrict his ability to communicate with Ms. O'Neill, except in an academic setting.

53. In an email exchange with Mr. Wellman asking about her status that day, Ms. O'Neill advised that she very much wanted to return to work but that the remedial measures identified by Ms. Wigginton were inadequate to the situation, particularly where Penn had previously tried a similar approach.

54. The sex-based hostile work environment created by HR was not the first time Penn's management permitted sex-based harassment against Ms. O'Neill in the workplace.

55. In the Fall semester, Messrs. Wellman and Stuart-Smith were aware that a former lab manager (male) subjected Ms. O'Neill to sexist, belittling, and harassing behavior.

56. The steps taken by Messrs. Wellman and Stuart-Smith to address the male lab manager's conduct, including trying to schedule them to be in the lab at different times, resulted in escalation of the male lab manager's harassing conduct.

9

57. Having been advised by Penn representatives that she had a right to file a Title IX complaint, Ms. O'Neill met with Michele Rovinsky-Mayer, Penn's Associate Vice President for Equity and Title IX Officer, on February 27, 2023.

58. During their meeting, Ms. Rovinsky-Mayer described the steps available to Ms. O'Neill to file a Title IX complaint, but also advised her that it was a lengthy process and that filing a complaint may not be in her best interests. As a result of that meeting, and because she trusted Penn to take appropriate steps to address the sex-based hostile work environment without a complaint, Ms. O'Neill elected not to file a Title IX complaint.

59. Soon thereafter, Ms. O'Neill became aware that HR posted a message on his public Instagram feed that included the following statement about her:

> When I realized (sic) how bad my depression was I reached out to a friend in university who I thought was close to me and she complained to the university admin saying some shit and got me into a big problem. Don't be that insensitive inhumane person and don't be that piece of shit who just doesn't care like everyone else around me.

60. On March 5, 2023, Ms. O'Neill shared a screenshot of HR's Instagram post with Mr. Stuart-Smith via text message. He responded: "This is horrible. Make sure you share it with Karl & Kayla too. There is a meeting coming up this week and this is important for that."

<u>Penn's Refusal to Correct and Prevent An Unsafe, Sexually Hostile Work Environment Forces O'Neill to Choose Between Her Safety and Her Job</u>

61. During Spring Break in March 2023, Ms. O'Neill was still out of work and still had not received confirmation from Penn that it was willing to take appropriate remedial action with respect to HR.

62. At around that time, Mr. Stuart-Smith called Ms. O'Neill to discuss her plans to return to the lab. Ms. O'Neill reiterated that she would not return to the lab until she felt assured

of her safety. In response, Mr. Stuart-Smith suggested that Ms. O'Neill consider hiring a security guard.

63. On March 16, 2023, Ms. Wigginton informed Ms. O'Neill by telephone that Penn would not take any additional steps to address the sex-based hostile work environment in the lab, and that she would be expected to return to work and have contact with her harasser in the lab.

64. Ms. O'Neill was very upset and frustrated by Penn's failure to act, and asked Ms. Wigginton whether she needed to get raped for Penn to take the situation seriously.

65. During Ms. O'Neill's absence from the office, the Penn Robotic and Autonomous Systems (RAS) graduate students who had been working with her in the Robotics lab submitted a complaint about HR's conduct and its resulting impact on Ms. O'Neill as well as the quality of their education. In that complaint, the Penn graduate students expressly referenced concerns about HR's bullying and harassment towards students, which had been previously shared with the University prior to the incidents with Ms. O'Neill.

66. Upon information and belief, Penn representatives met with the students in the Masters of Science in Design program in response to their complaint and attempted to excuse HR's misconduct based on a disability.

67. On the afternoon of March 16, 2023, Ms. O'Neill ran into Masoud Akbarzadeh, one of her former Penn professors, at the Reading Terminal Market. Upon seeing her former professor and in response to his warm greeting of her, Ms. O'Neill broke down crying and explained what had happened with HR and Penn's failure to resolve the situation.

68. During their discussion, Professor Akbarzadeh suggested to Ms. O'Neill that she consider transferring her position and working with him in the Polyhedral Structures Laboratory

where he worked, which was in a separate physical location, but was also part of the ARI lab. They agreed to meet the following Monday, March 20, 2023, at Penn's Pennovation Center.

69. By letter dated March 17, 2023, Mr. Wellman advised Ms. O'Neill that she was expected to return to work on or before March 27, 2023, and that the "measures and protocols" Penn had put in place for the lab included an agreement that HR would be permitted to speak to her "in the academic setting (e.g., the classroom/lab)." The letter again advised Ms. O'Neill that she could file a formal complaint with the University's Title IX office.

70. When Ms. O'Neill sought clarification about the consequences of her refusal to return without additional remedial measures, Mr. Wellman notified her that Penn would consider her to have abandoned her position.

71. On Monday, March 20, 2023, Ms. O'Neill met with Professor Akbarzadeh, excited about the chance to get back to work. However, Professor Akbarzadeh advised Ms. O'Neill that Mr. Stuart-Smith had objected to any transfer from his lab unless she agreed to continue as Teaching Assistant for his studio, which would require contact with her harasser. Ms. O'Neill confirmed to Mr. Akbarzadeh that she could not continue her employment at Penn if it required that she regularly face her harasser.

72. On March 22, 2023, Ms. O'Neill confirmed in an email to Messrs. Wellman and Stuart-Smith that she could not return to work without additional remedial measures to address the sex-based hostile work environment. Ms. O'Neill communicated that her decision to leave "[broke] her heart" but that Penn's actions did not protect her.

73. Penn terminated Ms. O'Neill's employment, effective March 27, 2023.

74. As of March 27, 2023, there were only a few weeks left in the semester before exams.

75. Penn allowed HR to remain in the program, and he graduated with his degree.

76. In late July and into August 2023, HR resumed sending harassing messages to Ms. O'Neill on Discord, which corroborated Ms. O'Neill's fear that her safety was at risk if she had returned to work with him. Specifically, HR sent the following messages:

**7.26.2023 at 11:14 pm:**
Hi soph
Miss you
You are my favourite person. I don't know why cut me off. We had such a good bond.

**7.26.2023 at 11:25 pm:**
I still think of you everyday

**7.27.2023 at 12:27 am:**
You are the only person who made smile like that in my whole life
And subconsciously you were the one who stopped my PTSD attack that day

**7.27.2023 at 3:46 am:**
And when I had psychosis I only heard your voice in my head and you used to talk to me and keep me safe and from killing myself.

**7.29.2023 at 7:10 pm:**
I love you so much
It hurts me

**7.30.2023 at 2:36 am:**
I'm not able to sleep at night because I keep thinking of you being by my side.

**7.30.2023 at 8:31 pm:**
I'm not able to do anything because I'm just thinking of you all day looking at the wall and smiling

**7.30.2023 at 8:40 pm:**
I'm sorry if I did anything wrong to you and pissed you off to the point you are doing this to me. Please let's meet. I don't want to lose you.

**8.1.2023 at 9:40 pm:**
(missed phone call)

**8.2.2023 at 4:03 am:**
(missed phone call)

**8.2.2023 at 9:02 pm:**
I'll give you so many kisses that you will lose count (kissing emoji)

**8.2.2023 at 10:25 pm:**
I want to marry you and make you my wife (six heart/face emojis)

**8.3.2023 at 11:38 am:**
(Screenshot of HR posing on a bridge in London)

**8.3.2023 at 7:37 pm:**
(missed phone call)

**8.4.2023 at 3:48 pm:**
I have moved from my old place to [street address] Philadelphia

77. The street address identified in HR's last message in August 2023 was in the same neighborhood where Ms. O'Neill lived while teaching at Penn.

78. In addition to these harassing and threatening communications on Discord, on August 12, 2023, HR contacted another former student asking for Ms. O'Neill's personal phone number. The next day, HR sent Ms. O'Neill a request to connect on LinkedIn.

<u>Penn's Refusal to Protect O'Neill from Sexual Harassment by a Mental Unstable Male Student Violated Her Civil Rights</u>

79. The sex-based harassment to which Ms. O'Neill was subjected was unwelcome.

80. Ms. O'Neill believed her work environment was hostile and abusive as a result of HR's sex-based harassment of her, and the harassment unreasonably interfered with her ability to perform her job duties.

81. The sex-based harassment to which Ms. O'Neill was subjected was severe and/or pervasive such that a reasonable person in her position would find her work environment to be hostile and abusive.

82. Penn failed to take reasonable steps to correct the sex-based hostile work environment to which Ms. O'Neill was subjected, or to prevent it from continuing in the future.

14

83. Ms. O'Neill made the difficult, but entirely reasonable, decision not to return to work because of Penn's failure to take appropriate remedial action in response to HR's sex-based harassment of her.

84. Penn's failure to remedy the sex-based harassment that plagued her work environment forced Ms. O'Neill to resign her employment.

85. The working conditions to which Ms. O'Neill had been subjected became so intolerable that any reasonable person in her position would have felt compelled to resign.

86. As a result of the sex-based hostile work environment to which she was subjected, Ms. O'Neill suffered significant emotional distress and mental anguish.

87. As a result of Penn's actions, and her constructive discharge, Ms. O'Neill suffered, and continues to suffer, additional emotional distress and mental anguish as well as harm to her professional and academic reputation.

88. As a result of Penn's discriminatory conduct, Ms. O'Neill has suffered, and will continue to suffer, a loss of earnings and/or earning capacity.

89. Penn's discriminatory actions were willful and taken with malice and/or reckless disregard for Ms. O'Neill's civil rights and warrant the imposition of punitive damages.

<u>Penn Retaliated Against O'Neill By Giving Her a Negative Employment Reference</u>

90. Throughout her employment at Penn, Ms. O'Neill met or exceeded all expectations for her job performance.

91. Upon her departure from Penn, Ms. O'Neill engaged in reasonable efforts to secure new employment.

92. Mr. Stuart-Smith offered to be a reference for Ms. O'Neill, so she included his contact information on her resume.

93. On or about May 4, 2023, Ms. O'Neill filed her administrative complaint with the Philadelphia Commission on Human Relations (PCHR) in which she asserted allegations of sex-based discrimination, including sexual harassment, against Penn.

94. On June 22, 2023, the PCHR notified Ms. O'Neill that her complaint had been served on Penn.

95. Upon information and belief, Penn notified Mr. Stuart-Smith (and others) about Ms. O'Neill's civil rights complaint upon its receipt.

96. In early July 2023, Ms. O'Neill received an offer as an outside consultant from Hyperion Robotics in Espoo, Finland, which was expected to lead to additional opportunities with the growing company.

97. On July 10, 2023, Hyperion Robotics sent a contract for the position to Ms. O'Neill for review and execution.

98. On July 12, 2023, rather than connect with her contact at Hyperion Robotics as expected, Ms. O'Neill received an email withdrawing the offer which stated: "After understanding new information ***about your past work with your listed references*** we believe that the Hyperion community will not be right for you." (emphasis added).

99. Mr. Stuart-Smith was the only work-related reference Ms. O'Neill had provided to Hyperion Robotics.

100. Upon information and belief, Mr. Stuart-Smith gave a negative reference about Ms. O'Neill to Hyperion Robotics, and possibly many other prospective employers, in retaliation for filing an administrative complaint of discrimination.

101. Penn's negative reference of Ms. O'Neill constitutes a materially adverse action that would discourage a reasonable worker from complaining about sex-based harassment.

102. As a result of Penn's retaliatory actions, Ms. O'Neill suffered, and continues to suffer, additional emotional distress and mental anguish as well as harm to her professional and academic reputation.

103. As a result of Penn's retaliatory conduct, Ms. O'Neill has suffered, and will continue to suffer, a loss of earnings and/or earning capacity.

104. Penn's retaliatory actions were willful and taken with malice and/or reckless disregard for Ms. O'Neill's civil rights and warrant the imposition of punitive damages.

## COUNT I
### Sex-Based Discrimination in violation of Title VII of the Civil Rights Act of 1964

105. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

106. Defendant violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiff to a sex-based hostile work environment.

107. Defendant violated Title VII of the Civil Rights Act of 1964, as amended, by failing to correct and/or prevent the sex-based hostile work environment to which Plaintiff was subjected resulting in the constructive discharge of her employment.

## COUNT II
### Sex-Based Discrimination in violation of the Philadelphia Fair Practices Ordinance

108. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

109. Defendant violated the Philadelphia Fair Practices Ordinance by subjecting Plaintiff to sex-based hostile work environment.

110. Defendant violated the Philadelphia Fair Practices Ordinance by failing to correct and/or prevent the sex-based hostile work environment to which Plaintiff was subjected resulting in the constructive discharge of her employment.

## COUNT III
### Retaliation in violation of
### Title VII of the Civil Rights Act of 1964

111. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

112. Defendant's actions against Plaintiff, including giving negative employment references about Plaintiff to prospective employer(s), constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

## COUNT IV
### Retaliation in violation of
### Philadelphia Fair Practices Ordinance

113. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

114. Defendant's actions against Plaintiff, including giving negative employment references about Plaintiff to prospective employer(s), constitute retaliation in violation of the Philadelphia Fair Practices Ordinance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sophia O'Neill, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. Declare the acts and practices complained of herein to be a violation of the Title VII of the Civil Rights Act of 1964;

B. Declare the acts and practices complained of herein to be a violation of the Philadelphia Fair Practices Ordinance;

C. Award to Plaintiff compensatory damages for all past and future economic losses resulting from Defendant's discrimination and retaliation, including, but not limited to, lost earnings, lost earnings growth potential, all other compensation and benefits lost due to Defendant's actions, all out of pocket losses, and an award of front pay since reinstatement to a sex-based hostile work environment is not appropriate;

D. Award to Plaintiff compensatory damages for all past and future non-economic losses she suffered as a result of Defendant's discrimination and retaliation, including but not limited to emotional distress, mental anguish, and harm to her professional and academic reputation;

E. Award to Plaintiff punitive damages for Defendant's willful and/or reckless disregard for her legal rights;

F. Award to Plaintiff all costs, disbursements, and reasonable attorneys' fees relating to the enforcement of her rights;

G. Award to Plaintiff pre-and post-judgment interest as well as the sum necessary to make up for any adverse tax consequences incurred by her as result of any judgment entered in this matter; and

H. Grant to Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>JURY TRIAL DEMANDED</u>

Plaintiff hereby requests a jury trial on each of the Counts in this Complaint.

UEBLER LAW LLC

<u>*/s/Julie A. Uebler*</u>
Julie A. Uebler, Esquire (ID No. 71297)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
(484) 875-3186 (Voice)
(484) 875-9273 (Fax)
uebler@ueblerlaw.com

*Attorney for Plaintiff
Sophia O'Neill*