### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOPHIA O'NEILL | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 25-1129 |
| | : | |
| TRUSTEES OF THE UNIVERSITY OF | : | |
| PENNSYLVANIA | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                   **October 31, 2025**

A woman working in her alma mater university as a teaching assistant and lab manager claims one of the larger male students in her lab harassed and physically intimidated her in February of the Spring 2023 semester, including sending her romantic messages over a holiday weekend during the male student's psychotic depression episode which she later construed as sexual harassment. The teaching assistant adduced evidence of the male student's improper repeated conduct. She told the university immediately upon discovering the improper messages after the holiday weekend. The university enacted a safety plan including precluding physical interaction between the male student and the teaching assistant. The teaching assistant remained upset and would not return to work unless the university met her demand of precluding its male student from working in the lab or interacting with her. The university implemented a plan but did not agree to all the teaching assistant's requests and she did not return to work. The teaching assistant further claims a university professor gave a job reference to a potential employer which later withdrew its employment offer after she filed a complaint with a Philadelphia Board. The teaching assistant assumes, despite direct contrary denials, the university professor knew of her complaint at the time he gave his reference to her prospective employer.

The question today is whether the teaching assistant can proceed on hostile work environment, constructive discharge, and retaliation claims against her former employer university based on conduct by a student non-employee of the university. We agree with the teaching assistant as to the nature and pervasiveness of the male student's improper conduct both before and during his psychotic episode. His conduct cannot be excused, and we appreciate the teaching assistant's concern. But she adduced no evidence which would allow a jury to find the university could be liable to its employee teaching assistant for creating a sex-based hostile work environment based on the male student's conduct, constructive discharge when she left employment, or retaliation. We are guided in part from recent comprehensive analysis from the Court of Appeals for the Sixth Circuit (absent guidance from our Court of Appeals) persuading us the teaching assistant must show the university was substantially certain its actions would cause harassment. The teaching assistant did not adduce evidence meeting this standard. And the teaching assistant also did not adduce evidence meeting the analogous "knew or should have known" standard applied by other colleagues based on administrative agency guidance. We agree the teaching assistant adduced evidence under state law not before us for a jury to consider against the student for his conduct. But she has not adduced evidence allowing a jury to find her university employer liable under federal law when the student harasser is not a university employee. We grant the university's Motion for summary judgment finding no evidence of a sex-based hostile work environment created or fostered by the university or otherwise creating a genuine issue of material fact on the teaching assistant's constructive discharge or retaliation claims.

## I.    Undisputed Material Facts[1]

The University of Pennsylvania offers a one-year "Master of Science in Design: Robotics and Autonomous Systems" degree through its Stuart Weitzman School of Design.[2] The University

intends for its program to allow students to "explor[e] architectural design through [artificial intelligence] and robotic fabrication."[3] The University granted Sophia O'Neill a master's degree in Robotics and Autonomous Systems in 2022.[4] She then began working for the University in two roles in Fall 2022.

She started as a full-time Research Associate—also known as a Lab Manager—in the Advanced Research and Innovation Robotics Lab for the Stuart Weitzman School of Design.[5] The University required Ms. O'Neill to be responsible for "[s]upport[ing] student coursework and faculty research activities" in the Robotics Lab including completing and cleaning up after robot tasks in the lab.[6] The University required Ms. O'Neill work in person in the Robotics Lab.[7] Senior Executive Director Karl Wellman and Program Director Robert Stuart-Smith supervised Ms. O'Neill in the Robotics Lab.[8] She worked with Lab Manager Nick Sideropolous.

Ms. O'Neill also worked as a Teaching Assistant in the Robotics and Autonomous Systems program in the Fall 2022 semester.[9] Her Teaching Assistant role included helping students with assignments.[10] Ms. O'Neill served as a Teaching Assistant for Program Director Stuart-Smith's studio course and for Jeffrey Anderson's lecture-based course in the Spring 2023 semester.[11]

### *Eight students complained about fellow Student HR in Fall 2022.*

University Student HR, a six-feet-four-inches tall man, participated in the Robotics Lab while Ms. O'Neill and Mr. Sideropolous worked as Lab Managers.[12] Eight students—seven men and one woman—complained about Student HR's conduct in the Lab.[13] The sole woman student to complain is identified as Student 1; she emailed Program Director Stuart-Smith on October 2, 2022 about Student HR's aggressive conduct in her student group hoping his conduct was not related to her gender.[14] Two men students along with Student 1 emailed Program Director Stuart-Smith a month later addressing issues they had working with HR.[15]

Ms. O'Neill did not report concerns with Student HR during the Fall 2022 semester. But today - in this case - Ms. O'Neill claims Student HR operated the Lab's robots at "unsafe" speeds during the Fall 2022 semester.[16] She also claims HR would ask her for help with his assignments without completing work beforehand and would physically intimidate her by hovering over her desk at least once a week.[17] Student HR did not hover over Lab Manager Sideropolous.[18] But Ms. O'Neill cannot recall reporting HR made her feel physically intimidated during the Fall 2022 semester.[19] Ms. O'Neill did not report HR engaged in sexually harassing behavior in Fall 2022.[20]

***Student HR's aggressive conduct towards Ms. O'Neill in the Spring 2023 Semester.***

Ms. O'Neill noted concerns about Student HR early in the Spring 2023 semester. Student HR blocked Ms. O'Neill's path to her desk on February 3, 2023 after she returned to the Robotics Lab following a work happy hour.[21] Student HR emailed Program Director Stuart-Smith accusing Ms. O'Neill of being "tipsy."[22] Student HR hovered over Ms. O'Neill's desk and demanded she give him answers to an assignment on February 20, 2023.[23] Ms. O'Neill told Program Director Stuart-Smith HR asked her for the answers to the assignment but cannot remember whether she also told him HR hovered over her desk.[24]

Student HR also waited for Ms. O'Neill outside of the Robotics Lab when she arrived for work at 8:45 AM on February 22, 2023.[25] He blocked Ms. O'Neill's path again later in the morning while she was trying to exit from a separate room housing a robot until Ms. O'Neill asked him to move.[26]

Ms. O'Neill left the room housing the robot, went to her desk, and opened several messages HR had sent her on messaging platform Discord between Saturday February 18, 2023 and Tuesday February 21, 2023 which included:

- Saturday February 18 at 7:31 AM:  HR: "Hey, [S]oph. I think I'm going too deep into depression. Please come home and stay with me if you can."[27] HR continued "Love you so much babe . . . come soon" with a heart emoji and a kissing face emoji at 8:02 PM.[28]

- Sunday February 19 at 2:43 AM: tried to call Ms. O'Neill.[29]

- Sunday February 19 after the attempted middle-of-the-night call: HR messaged, "Sorry. I had a depressive psychotic episode the past three days. I'm fine today" at 3:40 PM.[30]

- Tuesday February 21 at 1:25 AM: HR messaged "Going to surprise you" with a heart emoji.[31]

HR confirmed his depressive and psychotic episodes over this Presidents' Day holiday weekend. He called Program Director Stuart-Smith on Saturday February 18 and messaged him on February 19: "Sorry for calling you yesterday. I had a depressive psychotic episode on Friday and Saturday. Called you because I needed to be helped[.] Almost back to normal today. My doctor prescribed me some medicine for it."[32]

### Ms. O'Neill reports HR's behavior on February 22, 2023 upon seeing his messages.

HR did not reference a romantic attraction to Ms. O'Neill until his Presidents' Day Holiday Weekend Discord messages.[33] Ms. O'Neill immediately reported these inappropriate romantic messages to her supervisor Senior Executive Director Wellman after she opened them on February 22, 2023.[34] Senior Executive Director Wellman and Ms. O'Neill then walked together to Associate Director of Student Support Kayla Richards's office.[35] Associate Director Richards, Senior Executive Director Wellman, and Ms. O'Neill then talked to the University's Director of Special Services for the Division of Public Safety Paige Wigginton over the phone.[36]

The University removed HR from the Robotics Lab by 12:30 PM on Wednesday February 22, 2023 within a couple hours of Ms. O'Neill learning of the inappropriate Discord messages.[37]

Ms. O'Neill then returned to the Lab to collect her belongings and go home for the day.[38] Ms. O'Neill described the messages as not "particularly sexual" in a March 9, 2023 email to her uncle but later described them as sexual.[39]

### The University develops a safety plan for Ms. O'Neill.

The University developed a safety plan for Ms. O'Neill shortly after speaking with her and Student HR.[40] The safety plan limited HR to using the Robotics Lab only when Lab Manager Sideropolous worked.[41] It also prohibited HR from speaking with Ms. O'Neill outside of an academic setting.[42] The University told HR he could also face disciplinary proceedings with the University's Office of Community Standards and Accountability if he violated this safety plan.[43] University Director Wigginton and Lauren Rudick—the Director of Student Intervention Services—met with HR to explain the safety plan to him.[44] HR agreed to the plan.[45]

But Ms. O'Neill wanted "a guarantee [she] would never have to interact with" HR.[46] Ms. O'Neill wanted assurance HR could not access the Robotics Lab even when she was not working despite HR needing access to the Lab to complete his degree.[47]

### Ms. O'Neill does not return to work.

Ms. O'Neill did not return to work after February 22, 2023 but the University continued to pay her and she continued to receive benefits.[48] Senior Executive Director Wellman asked Ms. O'Neill to return to work by March 27, 2023 unless she applied for a formal leave in a March 17, 2023 letter.[49] Senior Executive Director Wellman told Ms. O'Neill he would consider her to have abandoned her position if she did not return by March 27 without applying for a formal leave.[50] Ms. O'Neill confirmed she would not return to work on March 22, 2023.[51] HR did not contact Ms. O'Neill between February 22, 2023 and March 27, 2023 but did post on Instagram on March 5, 2023 to complain about her decision to report his behavior.[52]

***A prospective employer withdraws an employment offer to Ms. O'Neill.***

Ms. O'Neill hired a lawyer who filed a complaint with the Philadelphia Commission on Human Relations on May 5, 2023 alleging, among other things, Program Director Stuart-Smith told Ms. O'Neill to "consider hiring a security guard" and objected to Ms. O'Neill transferring from the Lab "unless she agreed to continue as Teaching Assistant for his studio, which would require contact with her harasser."[53] Ms. O'Neill through counsel sent notice of her complaint to the University's general counsel's office the same day.[54] Ms. O'Neill also began looking for a job and applied for a position with Hyperion Robotics which extended a preliminary offer on July 1, 2023 and sent her an employment contract on July 10, 2023.[55] Hyperion Robotics withdrew its offer on July 12, 2023 "[a]fter understanding new information about [Ms. O'Neill's] past work with [her] listed references."[56]

Program Director Stuart-Smith likely agreed to be an employment reference for Ms. O'Neill at the time Ms. O'Neill applied for the Lab Manager position.[57] She also listed Program Director Stuart-Smith on the resume she sent to Hyperion Robotics.[58] He swore he only gave Hyperion Robotics information on Ms. O'Neill's degree.[59] He did not know about Ms. O'Neill's May 5, 2023 Philadelphia Complaint until August 18, 2023 when the University's general counsel emailed him about it.[60] Program Director Stuart-Smith described himself as "unhappy with the way" Ms. O'Neill portrayed the events in her allegations.[61] Ms. O'Neill amended her complaint with the Philadelphia Commission on August 23, 2023 to add a retaliation claim after Hyperion Robotics withdrew its offer six weeks earlier.[62]

Ms. O'Neill then sued the University for creating and fostering a sex-based hostile work environment, for constructive discharge, and for retaliation under Title VII and the Philadelphia Fair Practices Ordinance.[63]

## II.    Analysis

The University moves for summary judgment on Ms. O'Neill's hostile work environment, constructive discharge, and retaliation claims.[64] Ms. O'Neill opposes.[65] We studied voluminous materials adduced in discovery and otherwise mindful of the deference to the non-moving party's arguments.[66] Our study did not uncover a genuinely disputed issue of fact material to Ms. O'Neill's three claims or the University's defenses. We grant summary judgment for the University on all claims.

### A.  We dismiss Ms. O'Neill's sex-based hostile work environment claim.

Ms. O'Neill claims the University is liable under Title VII and the Philadelphia Fair Practices Ordinance for creating a hostile work environment based on HR's conduct.[67] The University moves for summary judgment on Ms. O'Neill's hostile work environment claims and argues Ms. O'Neill has not adduced evidence to show HR harassed her because of her sex, HR's harassment was severe or pervasive, or the University is liable for the harassment.[68] Ms. O'Neill responds she adduced evidence of genuinely disputed material facts in support of her sex-based hostile work environment claim.[69] We agree with the University. Ms. O'Neill has not adduced evidence to show it can be liable for HR's conduct or otherwise created a sex-based hostile work environment in February 2023.

Ms. O'Neill must establish the following five elements to hold the University liable for a hostile work environment based on sexual harassment: (1) she "suffered intentional discrimination because of [her] sex," (2) "the discrimination was severe or pervasive," (3) "the discrimination detrimentally affected" her, (4) "the discrimination would detrimentally affect a reasonable person in like circumstances," and (5) there is a basis for "employer liability."[70]  We find genuine issues of material fact on the sex-based harassment which a jury may find severe or pervasive. But we

find no evidence which would allow a jury to find the University liable for Student HR's sex-based hostile conduct in mid-February 2023.

### 1. A reasonable jury could find HR harassed Ms. O'Neill because of her sex in February 2023.

The University argues we should grant summary judgment because there is no evidence HR discriminated against Ms. O'Neill because of her sex.[71] Ms. O'Neill responds HR's hovering over her while asking for help with work, blocking her path, and sending her the February 2023 text messages all show HR intentionally discriminated against her because of her sex.[72] The University replies the February 2023 text messages cannot show intentional sex discrimination because Ms. O'Neill described the text messages as not "particularly sexual" in an email to her uncle.[73] We find Ms. O'Neill produced evidence a reasonable jury could use to find HR harassed her because of her sex.

An employee can show "[t]he intent to discriminate on the basis of sex" where someone engages in explicitly sexual conduct such as "in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language."[74] But an employee can still show intentional discrimination because of sex even if the "conduct or statements" at issue are not "explicitly sexual."[75] The employee need only show "that gender [was] a substantial factor in the discrimination."[76]

Viewing the record in a light most favorable to Ms. O'Neill there are facts a reasonable jury could use to find HR harassed her because of her sex. HR sent Ms. O'Neill several text messages in February 2023 where he told her he "love[s] [her] so much" with a heart emoji and kissing face emoji, asked her to come over to his home, and told her he was "[g]oing to surprise [her]" with a heart emoji.[77] A reasonable jury could find HR engaged in these romantic advances and confessions of love because of Ms. O'Neill's sex especially considering HR sent Program

Director Stuart-Smith a message during the same timeframe devoid of romantic overtures.[78] Ms. O'Neill also stated HR would not hover over Lab Manager Sideropolous the way HR would hover over her.[79] A reasonable jury could thus also find HR physically intimidated Ms. O'Neill by hovering over her or blocking her path because of her sex.[80] We deny the University's motion for summary judgment on this ground.

### 2. A reasonable jury could find HR's harassment was severe or pervasive.

The University argues HR's behavior—including hovering over Ms. O'Neill, blocking Ms. O'Neill's way, and sending her messages over the holiday weekend—does not amount to severe or pervasive harassment.[81] Ms. O'Neill responds a reasonable jury could conclude HR's behavior altered Ms. O'Neill's employment.[82] We find Ms. O'Neill adduced enough evidence for a reasonable jury to find she experienced severe or pervasive harassment.

Harassment is only severe or pervasive if it "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment."[83] We determine whether harassment creates a hostile or abusive work environment by "consider[ing] the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[84] We cannot base our analysis on "individual incidents" and instead must evaluate "the overall scenario."[85] For example, physically threatening behavior—especially when coupled with unwanted comments or attention—might tip the scale towards finding harassment to be severe or pervasive when considering the totality of the circumstances.[86]

We focus our analysis here on specific comments or incidents.[87] Ms. O'Neill argues a jury could conclude HR created a hostile work environment by: (1) hovering over desk while asking for help with work at least once per week during the Fall 2022 semester, (2) blocking Ms. O'Neill's path to her desk on February 3, 2023 after she returned to the Robotics Lab following a work happy

hour, (3) hovering over Ms. O'Neill's desk and demanding the answers to an assignment on February 20, 2023, (4) trying to call Ms. O'Neill and sending her messages between February 18 and February 21, 2023, and (5) blocking Ms. O'Neill's path on February 22, 2023.[88]

We have no basis to find alleged and unreported conduct in the Fall 2022 semester is sex-based. But we are persuaded a reasonable jury could find HR physically intimated or threatened Ms. O'Neill and made unwanted romantic advances toward her in February 2023 given the content of the messages HR sent Ms. O'Neill—where he professed his love for her and told her he was "[g]oing to surprise her"—and HR's frequent hovering over her and blocking her path in February 2023. The evidence suggest Student HR tried to, at a minimum, intimidate Ms. O'Neill. We find evidence a reasonable jury could use to find HR's harassment was severe or pervasive enough to alter Ms. O'Neill's conditions of employment. We deny summary judgment on this ground.

### 3. No reasonable jury could find the University liable for a sex-based hostile work environment.

The University argues it cannot be liable for HR's harassment of Ms. O'Neill even if his behavior otherwise satisfies the elements needed to establish a hostile work environment claim.[89] The University raises two points. It first argues we should depart from our colleagues' "know or should have known" standard for holding employers liable for a non-employee's harassment and instead adopt the intent approach described less than three months ago by the Court of Appeals for the Sixth Circuit in *Bivens v. Zep, Inc.*[90] The University argues Ms. O'Neill did not adduce evidence a reasonable jury could use to find the University intended for HR to harass her.[91] It next argues Ms. O'Neill cannot show University is liable for HR's harassment even if we follow a "knew or should have known" approach.[92] Ms. O'Neill chose to address the intent argument derived from the Court of Appeals' *Bivens* analysis in a footnote.[93] She instead focuses her

response on arguing the University failed to take appropriate remedial action after Ms. O'Neill reported the sexual harassment.[94]

### a. An employer must either desire the intended harassment or be substantially certain it will occur to be liable for conduct by persons not in its employ who harass its employee.

We first address *whether* an employee like Ms. O'Neill can hold an employer like the University liable for a non-employee's harassment. Our Court of Appeals has not explicitly held she can.[95] But our colleagues consistently hold an employee can hold an employer liable for a non-employee's harassment—such as a student's harassment—under limited fact-specific circumstances.[96] We agree.

The more pressing question is *when* an employee can hold an employer liable for a non-employee's harassment. The Courts of Appeals for the First, Second, Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits instruct an employee can hold an employer liable for a non-employee's harassment when the employer "knew or should have known" of the harassing conduct and failed to take immediate and appropriate action.[97] These Courts of Appeals often base their reasoning on non-binding Equal Employment Opportunity Commission guidance.[98] Our Court of Appeals has not addressed this issue directly or in a precedential opinion.[99] But several of our colleagues have adopted this "knew or should have known" approach based on the then-existing circuit opinions.[100]

The Court of Appeals for the Sixth Circuit fulsomely addressed this issue approximately three months ago in *Bivens v. Zep, Inc.*[101] The employee in *Bivens* sued her former employer after her employer's client locked her in his office and asked her if they could date while she was on a sales call.[102] It claims to have departed from the "knew or should have known" standard (or so-called negligence standard) when deciding whether the employer could be liable when its client harassed its employee.[103] The Court of Appeals instructed, in a post-*Loper Bright* world, we should not simply parrot an agency interpretation.[104] It instead held an employer can only be liable for a

12

non-employee's harassment when the employer intended the harassment—meaning when the employer either "'desire[d]' an unlawful consequence from his actions or [was] 'substantially certain' that it [would] result."[105] The Court of Appeals for the Sixth Circuit reached this result after careful review of agency law.[106] It explained although Congress through Title VII typically requires intentional actions for liability, employers may be liable for their employees' harassment based on their own negligence because "agency law principles dictate that a harasser's unlawful intent may be imputed to the employer based only on the employer's negligence in allowing the harassment."[107] But it noted agency law cannot "impute . . . wrongful intent" to an employer where there is no agency relationship—such as the relationship between an employer and most non-employees.[108] It thus declined to follow the "knew or should have known" approach because (1) the Equal Employment Opportunity Commission likely did not have authority to issue the guidance relied on and (2) they relied on the guidance without a separate analysis based in agency law principles.[109]

We have no binding precedent within our Circuit guiding our analysis. But we are persuaded by the Court of Appeals for the Sixth Circuit's approach and predict our Court of Appeals would align with it.

But we also today apply the "knew or should have known" standard applied by many colleagues before the standard offered by the Court of Appeals in *Bivens.* We do not discern much difference with the "knew or should have known" analysis other than turning "should have known" to a "substantially certain" harassment would follow from its actions. We cannot discern how an employer "should have known" about conduct by persons not under its control or authority under agency law. The employer does not monitor all interactions of its employees with third parties. We appreciate a university has some control over its students including through discipline which

would not be true in a typical customer interaction with an employee. But the disciplinary process does not afford the university a prescient foresight to know which students may engage in sex-based harassment of its employees. We cannot discern how a university employer can be liable unless it knows of the student's sex-based harassment and allows or fosters the hostile work environment. It faces a different challenge once it knows of the risk of sex-based harassment from a student or is substantially certain harassment will occur from its conduct.

We find the University can only be liable for HR's harassment where it intended the harassment to occur because it either "'desire[d] to cause' [the] harassment or was 'substantially certain' that it would 'result from' its actions."[110] But we today apply the "knew or should have known" standard as well.

### b. A reasonable jury could not find the University intended or should have known HR would sexually harass Ms. O'Neill.

The University argues Ms. O'Neill has not adduced evidence to show it "desired or was substantially certain" HR would harass Ms. O'Neill.[111] Ms. O'Neill does not address whether there is evidence showing the University intended the harassment.[112] We agree with the University at least when, like today, the University promptly implemented a plan to stop the harassment of Ms. O'Neill while she worked for the University. We would face a much different situation if the University did not promptly act in response to Ms. O'Neill's concerns and the harassment continued.

In applying the Court of Appeals' *Bivens* analysis, an employer is liable for a non-employee's harassment when the employer either "desire[d]" the harassment or was "substantially certain" it would result.[113] For example, a jury could find an employer intended for sexual harassment to occur where it instructs an employee to be "'especially cordial' to a certain client"

14

and to "keep him satisfied" or "do[es] nothing despite knowing that a mentally ill patient was repeatedly grabbing nurses in a sexual manner."[114]

Ms. O'Neill did not adduce evidence the University or its employees knew HR physically intimidated or confessed unreciprocated romantic feelings for Ms. O'Neill until she reported his behavior to Senior Executive Director Wellman on February 22, 2023.[115] Ms. O'Neill did not report his harassing behavior to anyone with the University even though Ms. O'Neill felt HR physically intimidated her during the Fall 2022 semester.[116] Ms. O'Neill reported to Program Director Stuart-Smith about HR asking for answers to an assignment on February 20, 2023 but cannot remember telling him HR hovered over her desk while doing so.[117] We are mindful Student 1 reported HR's behavior in a group project to Program Director Stuart-Smith in October 2022 but she could not describe his behavior as sex-based; she instead hoped his behavior was unrelated to her gender. But a reasonable jury could not find Program Director Stuart-Smith's knowledge of HR's difficult group work behavior in October 2022 to Student 1 (with no references or concerns to Ms. O'Neill) would make the University substantially certain he would go on to physically intimidate and sexually harass Ms. O'Neill in February 2023.

We reach the same result even if we do not apply the Court of Appeals for the Sixth Circuit's *Bivens* analysis. Our Court of Appeals has not addressed the state of mind for the university employers in these sex-based hostile work environment claims although our colleagues have applied a "knew or should have known" standard. So, to ensure Ms. O'Neill of our fulsome review, we now turn to whether she adduced evidence sufficient to meet this almost-identical

standard of "knew or should have known" liability. We scoured the record and cannot find a genuine issue of material fact allowing a jury to evaluate this issue.

We recognize our colleagues—before the Court of Appeals for the Sixth Circuit's *Bivens* analysis—looked to other courts of appeals and determined an employer can be liable when a non-employee harasses its employee "where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."[118] The first portion of this analysis asks us to determine whether the employer had "actual or constructive knowledge of harassment."[119] The second portion asks us to determine "the adequacy of the employer's remedial and preventative responses."[120] This remedial obligation is critical because an employer's liability "is grounded not in the harassing act itself but in the employer's . . . ratification of the harassment through its failure to take appropriate and reasonable responsive action."[121] The University knew about HR's harassment when Ms. O'Neill reported it on February 22, 2023.[122] The issue under this test is whether a reasonable jury could find the University failed to take immediate and appropriate corrective action after learning about the harassment.

A remedial action is adequate if it stops the harassment.[123] But a remedial action can still be adequate even if it fails to stop the harassment if it was "reasonably calculated to prevent future harassment" at the time the employer implemented it.[124] We are guided by our Court of Appeals's finding a remedial action is reasonably calculated to prevent further harassment—even though its effectiveness could not be tested because the employee quit—where the employer's management (1) warned the harasser the "company does not tolerate any sexual comments or actions" and he may be "suspen[ded]" or "terminat[ed]" if he violates the policy, (2) required the harasser to "restore [the employee] to the [work] schedule immediately" after he had removed the employee

16

from the schedule, and (3) informed the employee "she should contact the company at any time regarding any improper language or sexual advances."[125] Our colleagues have gone on to find other remedial actions to be adequate where management responded to the report of harassment "without delay," met with the harasser and warned him he could be fired if the harassment did not stop, and changed shifts so the harasser and victim would not work together.[126]

The adduced evidence confirms Senior Executive Director Wellman walked with Ms. O'Neill to the Associate Director of Student Support's office immediately after Ms. O'Neill reported HR's messages.[127] They then met with the Director of Special Services for the Division of Public Safety.[128] The University removed HR from the Robotics Lab by 12:30 PM the same day so Ms. O'Neill could collect her belongings and go home.[129] The University then developed a safety plan for Ms. O'Neill which limited HR to using the Robotics Lab when her Lab co-Manager Mr. Sideropolous was available and prohibited HR from speaking with Ms. O'Neill outside of an academic setting.[130] The Director of Special Services for the Division of Public Safety and an employee with the University's Student Intervention Services met with HR to explain the plan to him.[131] HR would face disciplinary proceedings before the University's Office of Community Standards and Accountability if he violated the plan.[132] HR verbally agreed to follow the safety plan.[133]

Ms. O'Neill wanted more. She demanded the University prevent HR from accessing the Robotics Lab even when she was not working. But an employee "cannot object to" the remedy the employer chooses "if the remedy chosen . . . is adequate" or "dictate that the employer select a certain remedial action."[134] The University's implemented plan prevented HR from working with Ms. O'Neill in the Robotics Lab and from contacting her outside of an academic setting while also

warning HR he could be disciplined if he violated the plan. A reasonable jury could not find this plan to be inadequate at the time the University proposed it.[135]

We grant summary judgment for the University applying the alternative "knew or should have known" standard advocated by Ms. O'Neill.

### B.  We dismiss Ms. O'Neill's constructive discharge claim.

Ms. O'Neill claims the University constructively discharged her because it did not address the hostile work environment.[136] The University moves for summary judgment arguing Ms. O'Neill's did not adduce evidence to support the constructive discharge claim.[137] Ms. O'Neill counters the record shows the University forced her to resign from her position.[138] We agree with the University.

An employee seeking to establish a constructive discharge must show her employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."[139] We consider a number of factors when determining whether a reasonable person would resign including whether the employer: threatened the employee with discharge, encouraged the employee to resign, demoted the employee, subjected the employee to reduced pay or benefits, involuntarily transferred the employee to a less desirable position, subjected the employee to altered job responsibilities, or issued unsatisfactory job evaluations for the employee.[140] The employee ultimately "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."[141]

Ms. O'Neill did not report the harassment until February 22, 2023.[142] The University removed HR from the Robotics Lab the same day, put a safety plan in place for Ms. O'Neill, and

warned HR he could be subject to disciplinary proceedings if he violated the plan.[143] A reasonable jury could not find the University "knowingly permitted" HR to harass Ms. O'Neill.

We grant summary judgment for the University on Ms. O'Neill's constructive discharge claims.

### C.  We dismiss Ms. O'Neill's retaliation claim.

Ms. O'Neill claims the University retaliated against her for complaining about its actions by allowing Program Director Stuart-Smith to give a negative employment reference about her.[144] The University argues Ms. O'Neill's retaliation claims fail because she does not show an adverse employment action or a causal connection between a protected activity and an adverse action.[145] Ms. O'Neill counters citing the University's notice of Ms. O'Neill's Philadelphia Commission complaint before Program Director Stuart-Smith gave his reference to Hyperion Robotics.[146] We agree with the University.

A prima facie case of retaliation requires an employee show: (1) she engaged in protected activity, (2) her "employer took an adverse employment action against her," and (3) "a causal connection between her participation in the protected activity and the adverse employment action."[147] Former employees can bring retaliation claims against their former employers for events occurring after employment.[148] For example, a former employee might prevail on a retaliation claim where her former employer's actions "result[] in discharge from a later job, a refusal to hire [her], or other professional or occupational harm."[149]

We focus on causation. An employee satisfies the causation element at the prima facie stage if she produces "evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action."[150] An employee can show causation through evidence including "an employer's inconsistent explanation for taking an

adverse employment action . . . a pattern of antagonism . . . or temporal proximity 'unusually suggestive of retaliatory motive.'"[151] But an employee often cannot establish causation where she does not produce evidence showing the person taking the adverse employment action knew about the protected activity.[152]

Hyperion Robotics withdrew its employment offer to Ms. O'Neill on July 12, 2023 after "understanding new information about [Ms. O'Neill's] past work with [her] listed references."[153] Even assuming Program Director Stuart-Smith's reference to Hyperion Robotics could be considered an adverse employment action, Ms. O'Neill did not adduce evidence a reasonable jury could use to find her Philadelphia Commission complaint is the likely reason for the action.

Program Director Stuart-Smith swore he did not know about Ms. O'Neill's May 5, 2023 Philadelphia Commission complaint until August 18, 2023 when the University's general counsel emailed it to him.[154] Ms. O'Neill does not believe Program Director Stuart-Smith. She argues (beyond her say-so) a jury could find Program Director Stuart-Smith knew about the Philadelphia Commission complaint before July 12, 2023 despite his testimony because: (1) the University's general counsel's office received notice of the Philadelphia Commission on Human Relations complaint on May 5, 2023, (2) her Philadelphia Commission complaint included allegations about his conduct, and (3) he testified he was not happy about some of Ms. O'Neill's allegations about him in reference to a news article arising from Ms. O'Neill's complaint.[155] Her theories are speculative. The University's general counsel's office knowing about the complaint and the allegations about Program Director Stuart-Smith does not mean he knew about them.[156] She adduced no evidence such as deposition testimony or documents suggesting some connection or pattern of reporting between the University's general counsel and Program Director Stuart-Smith. And Program Director Stuart-Smith's testimony about his "unhapp[iness]" about the allegations

in the complaint is immaterial given his assertion he did not learn about it until August 18, 2023. Ms. O'Neill did not adduce evidence Program Director Stuart-Smith knew about the Philadelphia Commission complaint before giving his reference. And the fact Program Director Stuart-Smith gave his reference a little over two months after Ms. O'Neill filed her complaint is insufficient for a reasonable jury to find this complaint is the likely reason for the adverse action given the lack of other evidence—like knowledge of the protected activity—suggesting causation.[157]

And, even if she could somehow connect the causation dots from the University general counsel's knowledge to Program Director Stuart-Smith, Ms. O'Neill did not depose let alone adduce evidence of the potential employer being affected at all by Program Director Stuart-Smith's alleged reference. She is speculating—contrary to the record evidence—of what Program Director Stuart-Smith told the potential employer. And then, with an even longer reach, as to the potential employer's view.

We grant summary judgment for the University on Ms. O'Neill's retaliation claim.[158]

## III.    Conclusion

Ms. O'Neill did not adduce evidence a reasonable jury could use to find the University liable on her hostile work environment, constructive discharge, or retaliation claims. We grant summary judgment for the University.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts and an appendix in support of summary judgment. The Trustees of the University of Pennsylvania filed its Motion, Statement of Undisputed Material Facts, Memorandum in support of summary judgment, and Appendix. ECF 29. Sophia O'Neill opposed the motion, responded to the University's Statement of Undisputed Material Facts, included an Additional Statement of Undisputed Material Facts, and added a supplemental Appendix. ECF 34. The University filed a reply brief. ECF 40.

All references to ECF 29, ECF 34, and ECF 40 and their attachments will be to the CM/ECF pagination.

[2] MSD-RAS, https://ras.design.upenn.edu/ [https://perma.cc/7RG6-FA32] (last visited October 24, 2025).

[3] *Id.*

[4] ECF 34-1 at 1 ¶ 1; ECF 29-5 at 4.

[5] ECF 34-1 at 1 ¶ 1; ECF 29-5 at 4, 7; ECF 29-6 at 2.

[6] ECF 34-1 at 1 ¶ 2; ECF 29-5 at 9.

[7] ECF 34-1 at 1 ¶ 2; ECF 29-5 at 9–10.

[8] ECF 29-6 at 2. Assistant Professor Stuart-Smith is an Assistant Professor of Architecture at the University and is the Program Director for the Robotics and Autonomous Systems master's program. ECF 29-7 at 4; ECF 29-23 at 2. Mr. Wellman is the Senior Executive Director for Operations and Planning, Design, and Construction for the Stuart Weitzman School of Design. ECF 29-12 at 4.

[9] ECF 34-1 at 2 ¶ 3; ECF 29-5 at 4, 6, 10.

[10] ECF 34-1 at 3 ¶ 9; ECF 29-5 at 19.

[11] ECF 34-1 at 2 ¶ 4; ECF 29-5 at 11–12.

[12] ECF 34-1 at 2 ¶ 9; ECF 29-5 at 22.

[13] ECF 29-5 at 99–100.

[14] ECF 34-1 at 18 ¶ 59; ECF 29-27 at 2–3.

[15] ECF 34-10 at 3–4.

[16] ECF 34-1 at 2 ¶ 5; ECF 29-5 at 13–14.

[17] ECF 29-5 at 20–22.

[18] *Id.* at 21.

[19] ECF 34-1 at 3–4 ¶ 11.

[20] ECF 34-1 at 5 ¶ 14; ECF 29-5 at 31–32.

[21] ECF 34-1 at 4 ¶ 12; ECF 29-5 at 27–28.

[22] ECF 29-5 at 30–31; ECF 34-16 at 1–3.

[23] ECF 29-5 at 51–52.

[24] *Id.* at 52–53.

[25] *Id.* at 53–54.

[26] ECF 34-1 at 5 ¶ 13; ECF 29-5 at 47, 54.

[27] ECF 34-1 at 6 ¶ 18; ECF 29-9 at 2; ECF 29-5 at 34.

[28] ECF 34-1 at 6 ¶ 18; ECF 29-9 at 2.

[29] ECF 29-9 at 3.

[30] ECF 34-1 at 6 ¶ 19; ECF 29-9 at 3.

[31] ECF 34-1 at 7 ¶ 21; ECF 29-9 at 3.

[32] ECF 34-1 at 6–7 ¶ 20; ECF 29-10 at 2; ECF 29-7 at 23; ECF 29-5 at 36.

[33] ECF 34-1 at 5 ¶ 14; ECF 29-5 at 31–32.

[34] ECF 34-1 at 8 ¶ 24; ECF 29-5 at 54–55.

[35] ECF 34-1 at 8 ¶ 25; ECF 29-8 at 6.

[36] ECF 34-1 at 8 ¶ 25; ECF 29-14 at 21.

[37] ECF 34-1 at 8 ¶ 26; ECF 29-15 at 2; ECF 29-5 at 55–56.

[38] ECF 34-1 at 8 ¶ 26; ECF 29-5 at 56–57.

[39] ECF 29-5 at 42–43; ECF 29-11 at 2–3 (showing Ms. O'Neill emailed her uncle and described the messages as not "particularly sexual"); ECF 29-5 at 39, 42 (showing Ms. O'Neill viewed the messages as being sexual).

[40] ECF 34-1 at 8 ¶ 27 (disputing who made the safety plan but not disputing there was a safety plan); ECF 29-16 at 13–15; ECF 34-14 at 26.

[41] ECF 34-1 at 8–9 ¶ 28; ECF 29-5 at 61, 64; ECF 34-14 at 26; ECF 29-20 at 3.

[42] The parties claim to dispute this fact but the record shows they cannot dispute it. *Compare* ECF 34-1 at 9 ¶ 29 (disputing whether the safety plan prohibited HR from communicating with Ms. O'Neill outside of an academic setting), *with* ECF 29-5 at 67 (showing Ms. O'Neill agrees the University told HR he could not speak with Ms. O'Neill aside from in an academic setting when she was working as a Teaching Assistant); ECF 34-14 at 26 (email communicating safety plan

showing HR "can only speak with [Ms. O'Neill] in the academic setting of class"); ECF 29-20 at 3 (letter reciting safety plan showing HR could "only speak with [Ms. O'Neill] in the academic setting").

[43] ECF 34-1 at 9–10 ¶ 30; ECF 29-5 at 66–68; ECF 29-20 at 3.

[44] ECF 29-14 at 8; ECF 29-16 at 4–6.

[45] ECF 34-14 at 26; ECF 29-20 at 3; ECF 29-5 at 65–68.

[46] ECF 29-5 at 69, 74–75.

[47] *Id.* at 74–75.

[48] ECF 34-1 at 13–14 ¶ 43; ECF 29-5 at 91.

[49] ECF 34-1 at 13–14 ¶¶ 43–44; ECF 29-20 at 2–4; ECF 29-21 at 2–3; ECF 29-5 at 92–93.

[50] ECF 29-21 at 2.

[51] ECF 34-1 at 17 ¶ 54; ECF 29-25 at 2–4.

[52] ECF 34-1 at 17 ¶ 56; ECF 29-5 at 97; ECF 29-26 at 3–5. HR also sent Ms. O'Neill additional (and more disturbing) messages and tried to call her again between July 20, 2023 and August 4, 2023 months after she left the University's employ. ECF 29-35 at 2–4.

[53] ECF 34-6 at 26–42.

[54] *Id.* at 26.

[55] ECF 34-1 at 23 ¶ 74; ECF 29-33 at 2–10. The parties dispute whether Hyperion Robotics offered Ms. O'Neill a temporary position. *See* ECF 34-1 at 23 ¶ 74; ECF 29-5 at 117 (agreeing the position was temporary and had a definite end date); ECF 29-33 at 4 (showing the initial offer was for a position with "the possibility to continue until our new expansion is complete . . . [and] a Lead Robotic Design position available . . . if this work goes well"); *id.* at 7 (showing the "position is a temporary position and will end on the 1st day of January, 2024").

[56] ECF 34-6 at 6.

[57] ECF 34-4 at 9.

[58] ECF 34-6 at 4–5.

[59] ECF 29-7 at 10–11.

[60] ECF 34-4 at 10–11.

[61] *Id.* at 14–18.

[62] ECF 34-6 at 43–65.

[63] ECF 1.

[64] ECF 29-1 at 15–30; ECF 40 at 6–13. The University also moves for summary judgment on her claim for punitive damages. ECF 29-1 at 30–31; ECF 40 at 13.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quotation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party does not prevent summary judgment. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When determining whether a disputed fact is genuine, we draw all inferences in favor of the non-moving party. *Id.* We do not weigh evidence or make credibility determinations. *Spivack v. City of Phila.*, 109 F.4th 158, 165–66 (3d Cir. 2024) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021)).The Supreme Court "outlined two closely related methods for a movant to succeed at summary judgment": (1) under the "standard approach," the moving party may produce material facts, genuinely undisputed, entitling it to judgment as a matter of law; and (2) under the "*Celotex* approach," the moving party "may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case . . . *on which that party will bear the burden of proof at trial*." *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Summary judgment is appropriate where the nonmoving party does not make a showing sufficient to establish the existence of an element essential to its case and on which it bears the burden of proof at trial. *SodexoMAGIC*, 24 F.4th at 204 (citing *Celotex Corp.*, 477 U.S. at 322).

We "view the facts and draw reasonable inferences 'in the light most favorable to'" Ms. O'Neill as the "party opposing" the University's summary judgment motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

[65] ECF 34.

[66] Ms. O'Neill filed a responsive Statement of Material Facts with 279 additional facts (ECF 34-2) and several hundred pages of additional exhibits including publicly available guidance from a federal agency (ECFs 34-3 through 34-31). The offered additional facts proved largely extraneous to the elements of her claims and the University defenses. We do not know why she added legal authorities as an exhibit. We accepted and studied these facts to give Ms. O'Neill the full benefit of the deference as the non-moving party but remind her counsel of the need to comply with our published Policies in fairness to all litigants.

---

[67] ECF 1 at ¶¶ 105–10. We analyze Ms. O'Neill's Title VII and Philadelphia Fair Practices Ordinance claims together because the same standards apply to each claim. *See Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 713 (E.D. Pa. 2021) (citing *Ives v. NHS Hum. Servs., Inc.*, No. 15-5317, 2016 WL 4039644, at *2 n.1 (E.D. Pa. July 28, 2016)) ("Claims brought under the . . . [Philadelphia Fair Practices Ordinance] are analyzed under the same legal framework as Title VII claims").

[68] ECF 29-1 at 15–26.

[69] ECF 34 at 7–22.

[70] *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (describing the fifth element as "the existence of *respondeat superior* liability" while noting "[t]he first four elements establish a hostile work environment, and the fifth element determines employer liability").

[71] ECF 29-1 at 16.

[72] ECF 34 at 10–11.

[73] ECF 40 at 7.

[74] *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 15 Stat. 1072).

[75] *See Bumbarger v. New Enter. Stone & Lime Co., Inc.*, 170 F. Supp. 3d 801, 826 (W.D. Pa. 2016) (citing *Andrews*, 895 F.2d at 1484; *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)); *Andrews*, 895 F.2d at 1485 (noting "overt sexual harassment" is not "necessary to establish a sexually hostile environment" and an employee only needs "to show that gender is a substantial factor in the discrimination" (quoting *Tomkins v. Pub. Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1047 n.4 (3d Cir. 1977))); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999) (finding "Title VII may be applied" to events "triggered by sexual desire," "sexually hostile" events, "non-sexual but gender-based" events, and "facially neutral" events).

[76] *See Andrews*, 895 F.2d at 1485 (quoting *Tomkins*, 568 F.2d at 1047 n.4).

[77] ECF 29-9 at 2–3.

[78] *Compare* ECF 29-9 at 2–3 (showing HR told Ms. O'Neill he "love[s] [her] so much"), *with* ECF 29-10 at 2 (showing HR only texted Program Director Stuart-Smith "Sorry for calling you yesterday. I had a depressive psychotic episode on Friday and Saturday. Called you because I needed to be helped[.] Almost back to normal today. My doctor prescribed me some medicine for it").

[79] ECF 34-11 at 7–8 (showing Ms. O'Neill testified HR "would come extremely close to [her] desk" and HR "would never do this to Nick").

80 *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex' . . . . 'The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed'" (quotations omitted)).

81 ECF 29-1 at 17–21; ECF 40 at 7–9.

82 ECF 34 at 8–10, 12–17.

83 *See Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

84 *See Mandel*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

85 *See id.* (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005)); *see also Durham Life Ins. Co.*, 166 F.3d at 155 ("[I]t is settled law that courts should not consider each incident of harassment in isolation . . . . Rather, a court must evaluate the sum total of abuse over time"); *Nitkin*, 67 F.4th at 571(explaining we "do not look to the number of incidents in a vacuum" and instead view "'the frequency of the [allegedly] discriminatory conduct' in the context of a given case").

86 *Cf. Nitkin*, 67 F.4th at 572 (suggesting remarks were not severe—even though they "were obnoxious, unprofessional, and inappropriate"—because supervisor "never threatened [the employee], touched her, or propositioned her for a date or sex"); *Sousa v. Amazon.com, Inc.*, No. 22-3043, 2023 WL 7486751, at *3 (3d Cir. Nov. 13, 2023) (finding a supervisor's "periodic comments" and "occasional late-night phone calls [where] he sometimes inappropriately veered into [the employee's] personal life" were not severe or pervasive in part because there was "no allegation that they were physically threatening, humiliating, or even highly offensive"); *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) (finding evidence to support severe or pervasive harassment where another employee "pester[ed]" a female co-worker with "unnecessary questions and [hung] around her desk," asked her out multiple times, and then sent a her a note and then a three-page letter saying "he had been 'watching' and 'experiencing' her" and referencing sex).

87 *See Nitkin*, 67 F.4th at 570–71 (explaining an employee's claim cannot rest on her assertion the harassment occurred "'regularly' or 'all the time'" and instead must focus on specific comments or incidents).

88 *See* ECF 34 at 8–10; ECF 29-5 at 20–21 (showing Ms. O'Neill claims HR was physically intimidating her in the Fall 2022 semester at least once a week when he asked for help with work).

89 ECF 29-1 at 21–26.

90 *Id.* at 21–22 (citing *Bivens v. Zep, Inc.*, 147 F.4th 635 (6th Cir. 2025)).

---

[91] *Id.* at 22.

[92] *Id.* at 22–26.

[93] ECF 34 at 22 n.3.

[94] ECF 34 at 17–22.

[95] *Cf. Smith v. Kelly Servs. Inc.*, 802 F. App'x 728, 729 (3d Cir. 2020) (reviewing substitute teacher's claim students harassed her without identifying an issue with an employee trying to hold her employer liable for a non-employee's harassment).

[96] *See Mongelli v. Red Clay Consolidated Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 477 (D. Del. 2007) ("[E]mployers may, under certain circumstances, be held liable for sexual harassment suffered by their employees at the hands of non-employees"); *Rabinowitz v. St. Joseph's Reg'l High Sch.*, No. 18-16498, 2023 WL 3597633, at *5 (D.N.J. May 23, 2023) ("[A]lthough the Third Circuit has not addressed the question directly, it has applied the standard for hostile work environment to claims of student-on-teacher discrimination" (citing *Smith* , 802 F. App'x at 729).

[97] *See Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) ("We now hold that an employer may be held liable for sexual harassment on the part of a private individual . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct" (citing 29 C.F.R. § 1604.11(e)) (further citation omitted)); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1110–12 (8th Cir. 1997) (finding the Equal Employment Opportunity Commission's "guidelines . . . strike a balance between the two extremes" of no liability for and strict liability for a non-employee's harassment and addressing whether employer "was aware of the conduct and failed to respond appropriately" (citing 29 C.F.R. § 1604.11(e)); *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854 (1st Cir. 1998) (citing *Folkerson*, 107 F.3d at 756); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073–74 (10th Cir. 1998) (noting the "First, Eighth, and Ninth Circuits have followed the [Equal Employment Opportunity Commission's] guidelines on the issue of harassment by nonemployees" and agreeing to apply "a negligence theory of liability to the harassing acts of customers . . . . [b]ecause harassment by customers is more analogous to harassment by co-workers than by supervisors" and holding "employers may be held liable in these circumstances if they 'fail[] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known'" (quotation omitted)); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) ("When, as in this case, the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action"); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) ("[W]e now adopt the well-reasoned rules of the Equal Employment Opportunity Commission . . . in imputing employer liability for harassment by non-employees according to the same standards for non-supervisory co-workers, with the qualification that we 'will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees' . . . . the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or that it knew,

or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action'" (quoting 29 C.F.R § 1604.11(e) (further quotation omitted)); *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) ("[A]n employer may be liable for hostile work environments created by co-workers and third parties 'if it knew or should have known about the harassment and failed to take effective action to stop it . . . [by] respondin[ing] with remedial action reasonably calculated to end the harassment'" (emphasis removed) (quotation omitted); *see also Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) ("[A]n employer is liable for the harassment of a nonemployee or nonsupervisory employee if it was 'negligent either in discovering or remedying the harassment'" (quotation omitted); *but see Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 691–92 (7th Cir. 2005) (describing "the right question" regarding whether an employer is liable for an independent contractor's harassment is "whether the [employer] intentionally created or tolerated unequal working conditions").

[98] *See* 29 C.F.R. § 1604.11(e); *see also Folkerson*, 107 F.3d at 756 (citing 29 C.F.R. § 1604.11(e)); *Crist*, 122 F.3d at 1110–12 (citing 29 C.F.R. § 1604.11(e)); *Rodriguez-Hernandez*, 132 F.3d at 854 (citing *Folkerson*, 107 F.3d at 756); *Lockard*, 162 F.3d at 1073–74 (referencing the guidelines); *Summa*, 708 F.3d at 124 (adopting the guidelines).

[99] Our Court of Appeals cited a standard similar to the so-called negligence standards other Courts of Appeals apply in an unreported student-on-teacher harassment case without acknowledging it had not yet spoken on the issue. *See Smith*, 802 F. App'x at 729 ("[The employee] has not explained why [the employer] should be liable, since she did not establish that it was aware of the situation" (citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293–94 (3d Cir. 1999)). The case it cited was a coworker-on-coworker harassment case. *See Kunin*, 175 F.3d at 290 (noting "an employee . . . alleged that a co-worker had harassed her over a three-week period . . .").

[100] *See Johnson-Harris v. AmQuip Cranes Rental, LLC*, No. 14-767, 2015 WL 4113542, at *8 (E.D. Pa. July 8, 2015) (looking to "other circuit courts that have held an employer liable for the harassment of its employee by a nonemployee 'where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action'" (quotation omitted)); *Guthrie v. Baker*, 583 F. Supp. 2d 668, 679 (W.D. Pa. 2008) (relying on other Courts of Appeals opinions concluding employers can be held liable "where the employer knows or should have known of the conduct and fails to take immediate and appropriate corrective action"); *Graves v. Cnty. of Dauphin*, 98 F. Supp. 2d 613, 620 (M.D. Pa. 2000) ("Although the Third Circuit has yet directly addressed the question, the emerging trend among federal courts is to permit a cause of action under Title VII against employers for the sexual harassment of employees by non-employees. The First, Eighth, Ninth, and Tenth[] Circuits, as well as several district courts, have followed the [Equal Employment Opportunity Commission's] guidelines on this subject . . .").

[101] *Bivens v. Zep, Inc.*, 147 F.4th 635 (6th Cir. 2025).

[102] *See id.* at 641.

[103] *See id.* at 642–48. The Court of Appeals for the Sixth Circuit noted some of its colleagues' application of a "negligence" standard was "nominal[]" only. *See id.* at 647 ("[I]t bears noting that

many of the circuit cases that nominally apply a negligence standard would likely have been resolved the same way under the intent standard we adopt").

[104] *See id.* at 646 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2023)).

[105] *See id.* at 645 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 n.3 (2011)); *but see Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 627 (7th Cir. 2018) (noting an employer cannot be "vicariously liable" when a third-party harasses an employee and instead can only be "responsible for its own negligence" (quotation omitted)).

[106] *See Bivens*, 147 F.4th at 643–45 (noting an "employer can be held liable either directly, for its own intentional actions, or vicariously, for those of its agents" and explaining an employer can be liable for an agent's sexual harassment when the agent "was aided in accomplishing the tort by the existence of the agency relationship" or "the employer 'was negligent or reckless' in its own right in letting the agent commit the tort" (quoting Restatement (Second) of Agency § 219(2) (A.L.I. 1958)));.

[107] *See id.*

[108] *See id.* at 644–45 (noting a "principal-agent" relationship requires each to "give their mutual 'consent' to the notion that the [agent] would 'act'" on the principal's "'behalf' and 'subject to [its] control'" and finding there was no agency relationship between an employer and its client (quoting Restatement (Second) of Agency § 1(1) (A.L.I. 1958))).

[109] *See id.* at 645–46 (citing 42 U.S.C. § 2000e-12(a); 29 C.F.R. § 1604; *Loper Bright*, 603 U.S. at 395) (further citation omitted).

[110] *See id.* at 645.

[111] ECF 29-1 at 22.

[112] ECF 34 at 17–22 (focusing on whether the University took appropriate remedial action after Ms. O'Neill reported the sexual harassment).

[113] *See Bivens*, 147 F.4th at 645 (quoting *Staub*, 562 U.S. at 422 n.3).

[114] *See Bivens*, 157 F.4th at 647–48 (citing *Rodriguez-Hernandez*, 132 F.3d at 851–52; *Crist*, 122 F.3d at 1108–10).

[115] ECF 34-1 at 8 ¶ 24 (undisputed); ECF 29-5 at 55.

[116] ECF 34-1 at 3–4 ¶ 11.

[117] ECF 29-5 at 52–53.

[118] *See Johnson-Harris*, 2015 WL 4113542, at *8 (footnote omitted) (quoting *Armstead v. Exec. Cleaning & Supply, Inc.*, No. 12-2542, 2014 WL 4659935, at *13 (M.D. Pa. Sept. 17, 2014)) (citing *Pryor*, 791 F.3d at 498; *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001); *Crist*, 122 F.3d at 1111); *see also Guthrie*, 583 F. Supp. 2d at 679 (relying on other Courts of Appeals opinions concluding "employer can be held liable . . . where the employer knows or should have known of the conduct and fails to take immediate and appropriate corrective action" (citing *Lapka v. Chertoff*, 517 F.3d 974, 984 n.2 (7th Cir. 2008); *Watson*, 324 F.3d at 1258 n.2; *Rodriguez-Hernandez*, 132 F.3d at 854; *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 387 (5th Cir. 1987)) (further citation omitted).

[119] *See Johnson-Harris*, 2015 WL 4113542, at *8 (quoting *Turnbull*, 255 F.3d at 1244 ("The negligence analysis can be divided into two separate inquiries, looking first into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses").

[120] *See id.* (quoting *Turnbull*, 255 F.3d at 1244).

[121] *See Guthrie*, 583 F. Supp. 2d at 680.

[122] ECF 29-5 at 55; ECF 29-12

[123] *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 110 (3d Cir. 2009) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law" (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 412 n.8 (3d Cir. 1997))).

[124] *See Knabe*, 114 F.3d at 412 n.8 ("[I]t is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . . courts may still decide that the action was adequate as a matter of law"); *see also Johnson-Harris*, 2015 WL 4113542, at *9 (citing *Knabe*, 114 F.3d at 409, 412).

[125] *See Knabe*, 114 F.3d at 413.

[126] *See Neely v. McDonald's Corp.*, 340 F. App'x 83, 84, 86 (3d Cir. 2009).

[127] ECF 34-1 at 8 ¶¶ 24–25; ECF 29-5 at 55.

[128] ECF 34-1 at 8 ¶ 25.

[129] ECF 34-1 at 8 ¶ 26; ECF 29-5 at 56–57.

[130] ECF 34-1 at 8–9 ¶ 28; ECF 29-5 at 61, 64 (showing Ms. O'Neill agrees part of the safety plan required HR to use the lab when the other lab manager was working); ECF 29-20 at 3 (letter reciting safety plan and showing HR could "only sign up for time-slots in the robotics lab" when the other Lab Manager was available); ECF 29-5 at 67 (showing Ms. O'Neill agrees the University

told HR he could not speak with Ms. O'Neill aside from in an academic setting when she was working as a Teaching Assistant).

[131] ECF 29-14 at 8, 28; ECF 29-16 at 4–6.

[132] ECF 34-1 at ¶ 30; ECF 29-5 at 66–68; ECF 29-20 at 3.

[133] ECF 29-5 at 66–68; ECF 29-20 at 3.

[134] *See* ECF 29-5 at 74–75; *Knabe*, 114 F.3d at 414 (noting although employee thought her employer "should have . . . transferred [her harasser] from the restaurant or fired [him]" the remedy her employer chose—which included warning the harasser he could be suspended or fired if he violates the anti-harassment policy again—was adequate).

[135] To the extent Ms. O'Neill might argue HR's July and August 2023 text messages show the plan is not adequate her argument fails. *See* ECF 34 at 24 (arguing in constructive discharge section of brief HR's additional messages "corroborate her reasonable fears that the sex harassment would continue"); ECF 29-35 at 2–4. Just because a plan "failed to completely put an end to" harassing conduct "does not mean that [it was] inadequate at the time the[] measures were taken." *See Neely*, 340 F. App'x at 86 (citing *Knabe*, 114 F.3d at 415).

[136] ECF 1 at ¶¶ 107, 110.

[137] ECF 29-1 at 26–28; ECF 40 at 12.

[138] ECF 34 at 22–24.

[139] *See Mandel*, 706 F.3d at 169 (quoting *Aman*, 85 F.3d at 1084).

[140] *See id.* at 170 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)).

[141] *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994)).

[142] ECF 34-1 at 8 ¶ 24; ECF 29-5 at 55; ECF 34-1 at 3–4 ¶ 11 (showing Ms. O'Neill did not report HR physically intimidated her during the Fall 2022 semester); ECF 29-5 at 22–23; ECF 29-5 at 52–53 (showing Ms. O'Neill reported HR asked for the answers to an assignment but did not report he hovered over her desk).

[143] ECF 34-1 at 8 ¶ 26; ECF 29-5 at 55–56; ECF 34-1 at 8–9 ¶ 28; ECF 29-5 at 61, 64; ECF 29-20 at 3; ECF 34-1 at 9–10 ¶ 30; ECF 29-5 at 66–68; ECF 29-20 at 3.

[144] ECF 1 at ¶¶ 111–14.

[145] ECF 29-1 at 28–30; ECF 40 at 12–13.

[146] ECF 34 at 24–26.

<sup>147</sup> *See Moore v. City of Phila*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

<sup>148</sup> *See Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200–01 (3d Cir. 1994) ("[W]e join the majority of courts that have considered this issue and hold that an ex-employee may file a retaliation action against a previous employer for retaliatory conduct . . . aris[ing] out of or . . . related to the employment relationship"), *cert. denied* 513 U.S. 1022 (1994); *accord Boandl v. Geithner*, 752 F. Supp. 2d 540, 567–68 (E.D. Pa. 2010) ("[T]o make a claim for post-employment retaliation, a plaintiff must show that he engaged in protected activity, that his former employer had influence over a subsequent employment-related decision, and that his former employer 'made a retaliatory use of that influence to the detriment of' the plaintiff's 'employment opportunities'" (quoting *Charlton*, 25 F.3d at 200–01)).

<sup>149</sup> *See Boandl*, 752 F. Supp. 2d at 568 (quoting *Charlton*, 752 F. Supp. 2d at 200).

<sup>150</sup> *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017).

<sup>151</sup> *See id.* at 260 (citations and quotation omitted).

<sup>152</sup> *See Selvato v. SEPTA*, 658 F. App'x 52, 56 (3d Cir. 2016) (finding there was no evidence a jury could use to find causation where the only evidence the decisionmaker knew about the protected activity was evidence the decisionmaker communicated with those who knew about the activity as part of his job responsibilities); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding no facts to support causation where "there is no indication [the decisionmaker] even knew about" the protected activity before the adverse action while noting temporal proximity is only sufficient on its own where it is "very close" and citing cases finding 3- and 4-month periods were insufficient (citations omitted)).

<sup>153</sup> ECF 34-6 at 6.

<sup>154</sup> ECF 34-4 at 10–11.

<sup>155</sup> *See* ECF 34-6 at 26 (showing Ms. O'Neill's counsel sent the University's general counsel's office a copy of the Philadelphia Commission on Human Relations complaint on May 5, 2023); ECF 34-6 at 27–41 (showing the complaint included allegations about Program Director Stuart-Smith); ECF 34-4 at 15–18 (showing Program Director Stuart-Smith testified he was "unhappy with the way things were portrayed in the allegations" in reference to a phone call he had about a news article arising from the complaint because he felt there were "factually incorrect [allegations] that portrayed [him] in an untruthful light").

<sup>156</sup> *See Selvato*, 658 F. App'x at 56.

<sup>157</sup> *See Clark Cnty. Sch. Dist.*, 532 U.S. at 273.

[158] The University also asks us to grant summary judgment on Ms. O'Neill's request for punitive damages. ECF 29-1 at 30–31. We do not address this argument given we grant summary judgment for the University on all of Ms. O'Neill's claims.